# Ohio Laws in the U. S. Courts.

## THE STATUTE REGULATING SALES OF MERCHANDISE STOCKS IN BULK IS UNCONSTITUTIONAL.

[United States District Court, Northern District of Ohio, Eastern Division.]

### IN RE F. M. DAVIS & CO.*

*Constitutional Law—Statute Relating to Sales of Merchandise in Bulk —Deprivation of Property—Liberty of Contract.*

The Ohio act of April 4, 1902 [95 Ohio Laws, 96, 97], entitled "An act to prevent fraud in the purchase, disposition and sale of stocks of merchandise," is unconstitutional, as depriving one of property and liberty of contract without due process of law.

HAROLD REMINGTON, Referee in Bankruptcy.

The facts in this case are briefly as follows: The bankrupts were partners doing a retail grocery business in Cleveland, Ohio. In the autumn of 1902 they placed their business with a broker, Harry Susser, for sale. The broker advertised their store, along with others, in a newspaper. This advertisement came to the notice of the petitioner here, George Williams, who was then a resident of the city of Youngstown, Ohio. Mr. Williams was not acquainted with any of the parties, but desiring to change his business, came to Cleveland and sought out the broker. The broker told him about one or two places, including the store belonging to the bankrupts. Mr. Williams went out to the bankrupt's store and looked over the property with his wife, inspecting the stock and the premises quite thoroughly. He inquired of the partners as to whether the business was a paying business. They responded that it was. He then asked to look at their books, and

---

*The decision in this case was announced by Referee Remington in February last, and was affirmed by Judge Wing, of the U. S. District Court, without report, July 2, 1903.

they responded they were not keeping any books excepting a book recording daily sales. He saw a ledger on the table and opening it, said to them that he noticed it was not posted up to date. One of the partners then said that that was true; that the ledger had not been posted since July, and that it had been neglected because he himself was not a bookkeeper, and the other partner, who had been doing the bookkeeping, was away at Boston for her health, and that since her return she had not taken up the work of posting up the books. There were original invoices in the safe, but they were not produced to Mr. Williams, nor did he ask for them, nor is there any evidence that he actually knew of their existence as such, although there is evidence that they were in a package of papers along with others that were taken out of the safe and put into baskets in Mr. Williams' presence when the partners were cleaning up preparatory to leaving; nor is there any evidence that these invoices were specifically the invoices for the goods sold to Mr. Williams. Mr. Williams asked the partners if they had any creditors, but the evidence as to what they replied is conflicting. They said, in substance, either, "No, we have no creditors," or "No, only a few creditors for small amounts whom we will pay off at once with the proceeds of the sale." It was agreed the sale was not to be made by inventory, but was to be a "lumping off" of the entire stock.

After some haggling back and forth, it was finally agreed that a sale should take place for the sum of $1,000 cash, $50 of which was paid down, and a written memorandum of the agreement thereupon made, which recited that the balance was to be paid on the fourteenth day of the month, some eight days thereafter, and that meanwhile a representative of the purchaser was to be in charge of the store and a strict account kept of all receipts and expenditures, all of which should enure to the benefit of the purchaser.

Meanwhile the purchaser had searched the county recorder's office for chattel mortgages, but found none.

The parties reappeared at the office of Mr. Susser, the broker, for a more formal bill of sale. The broker read to one of the partners in the presence of the purchaser, but without particularly calling the purchaser's attention to it, the portion of the statutes regarding sales of merchandise in bulk that relates to the penalty imposed upon sellers who fail to furnish the requisite list of cred-

itors, etc. Nothing was read to the purchaser as to the purchaser's duties as the same are laid down by the statute. Mr. Susser told one of the partners, but not in the presence of the purchaser, that he would send notices to the bankrupts' creditors. The partners gave him the names of several of the creditors, but these were not all of the creditors of the partnership. To those whose names were given him, the broker did send notice of sale by mail, but did not send notice to all of the creditors, nor to a majority of them. Ultimately the consideration was paid and the purchaser put into exclusive possession.

The sellers, who are the bankrupts here, straightway paid a few of the firm creditors, and certain personal debts of one of the partners, and with the balance of the money went into bankruptcy, paying costs of court and attorneys' fees in advance, and leaving the majority of their firm creditors unpaid. The bankrupts were insolvent during these proceedings.

After the sale, and after the bankruptcy, the stock of goods was levied upon in attachment by certain of the sellers' creditors. Thereafter the sheriff surrendered possession to the trustee in bankruptcy, and the purchaser is now here petitioning for the stock of goods and for the fixtures, as well as for the after-acquired property. It is the finding of the referee that the sale was bona fide unless the statute recently passed by our Legislature operates to make it otherwise.

So far as the fixtures are concerned, no question is made, and they should be surrendered to the purchaser.

As to the stock of merchandise, the question is raised and is squarely presented by the facts as to the constitutionality of the law passed by the last Legislature of Ohio, making void sales, as well as other dispositions, of merchandise in bulk or of portions of an entire stock of merchandise, not sold in the ordinary course of trade, etc.

The law, except the original provisions of it, is as follows (95 O. L., 96) :

"Section 1. A sale, or other disposition of an entire stock of merchandise in bulk, or any portion of a stock of merchandise, otherwise than in the ordinary course of trade, and in the regular and usual prosecution of the seller's business, shall be fraudulent

and void as against the creditors of the seller unless the seller at least six days before such a sale, or other disposition, shall:

"First.    Deliver to the purchaser a full and correct statement of the names and places of residence, or places of business of each of his creditors.

"Second.    The amount due each.

"Third.    Also deliver to the purchaser true and correct books, or original invoices from which the cost price of the merchandise sold can be ascertained.

"Fourth.    And also unless the seller and the purchaser together, at least six days before the sale, or other disposition, make a full, detailed inventory, showing the quantity and the cost price to the seller of each article to be included in the sale, or other disposition.

"Fifth.    And unless such list of creditors, books, invoices and inventory be retained by the purchaser for at least six months after the sale, or other disposition, and be exhibited on demand to each creditor of said seller.

"Sixth.  · And unless the purchaser shall at least five days before the sale, or other disposition, in good faith, give notice of such proposed sale, or other disposition, and said cost price of the merchandise proposed to be sold, or otherwise disposed of, and the price to be paid therefor by the purchaser to each of the seller's creditors of whom the purchaser obtains the knowledge by the list aforesaid, or can, by the exercise of reasonable diligence gain knowledge—such notice to be given either personally or by registered letter, properly stamped, directed and mailed."

It is with reluctance that the referee attempts to pass upon the constitutionality of this law.    It is the uniform rule of federal courts that the decisions of the highest state courts, in interpreting and construing state statutes and in determining their constitutionality under their state constitutions, are to be followed.    Especially is it the duty of an inferior court, such as that of a referee in bankruptcy, to approach the question of constitutionality with diffidence.    However, it appears in the case at bar that there is no reported decision of any of the courts upon this particular law, and it further is the wish of all parties involved here that the referee should pass upon the question of the constitutionality of the act.    So the referee will undertake the task.

It will be observed that the statute requires upwards of thirty things to exist or to be done, upon the non-existence or the failure to perform any of which the sale in bulk is void and the contract between the seller and buyer defeated.    It will further be observed

that the sale is declared to be void and that the statute does not, as do several of the statutes of sister states upon this subject, simply lay down certain rules of evidence from which fraud is to be presumed subject to rebuttal by proof of the innocence of the parties. The sale in bulk is made absolutely void by failure to observe the formalities and to have the facts required by this Ohio statute; and perhaps intentionally so, for the reason that had it simply laid down rules of evidence—rebuttable presumptions—its efficacy would have been greatly impaired if not rendered almost nugatory.

Thus it will be observed that, first, the seller must deliver a statement to the purchaser. He must deliver it at least six days before the sale. It must be a full statement. It must be a correct statement. It must be a statement of names. It must also be a statement of places of residences or of business. It must be the names and places of residence or of business of his creditors and each of them.

Next, the seller must deliver to the purchaser books or original invoices. These books must be true and correct. He must deliver them at least six days before the sale. The original invoices (and the books as well, presumably) must be such as will show the cost price of the merchandise sold.

Next, an inventory must be made. It must be made at least six days before the sale or other disposition of the stock. It must be a full inventory. It must be a detailed inventory. It must show the quality of each article. It must show the cost price to the seller of each article. This inventory must be made by the seller and purchaser; and it must be made by them whilst together.

Next, such list of creditors must be retained by the purchaser, and must be retained by him for at least six months after the sale. It must also be exhibited on demand to each creditor of the seller. The books are to be similarly retained and exhibited on demand. So are the invoices. So is the inventory.

In addition to all this the purchaser is required to do certain things. He must give notice. The notice must be of the proposed sale. It must be given at least five days before the sale. It must be given "in good faith." The notice will not do, apparently, even if actually given unless it is given "in good faith."

The notice must state the cost price of the merchandise proposed to be sold. It must state the price proposed to be paid by the purchaser. It must be given to each of the seller's creditors shown upon the list above-mentioned or which the purchaser can, by exercising reasonable diligence, ascertain. Such notice is to be given either personally or by registered letter, and the letter must be properly stamped, directed and mailed.

The facts in this case show that none of these things were done. They further show that full and correct books of account were not kept. No definite showing is even made that the original invoices in the safe would have shown the cost price of every article sold, nor for that matter of any article then sold. It does not, in fact, appear in the evidence, that, at the time of the sale, it was even in the power of the seller to furnish either the required books or the alternatively required original invoices.

Such being the case, it does not appear from the evidence that it was possible for the sellers to conform to the statute; it does not appear then that they could sell in bulk their stock of merchandise at all.

This dilemma strikes me as indicating that one of the fundamental rights of property has been interfered with by this statute. It must be kept in mind that the statute is not concerned with the exercise of police power. It has no concern with public health, or public morals, nor does it pertain to uncovering deceiving appearances as is the case with the so-called oleomargarine laws. It is not dealing with nuisances. Its object, on the contrary, is solely to prevent the defrauding of creditors by dishonest sellers who, having converted their stock into cash, are thus the more readily enabled to get the proceeds of sale beyond reach of their creditors.

The evil aimed at is a real one and one of great magnitude and it is unfortunate if some remedy can not be devised that can reach it without attacking fundamental rights. However, it must be remembered that the real evil is not the selling in bulk at all, for that may be and usually is a proper proceeding, but it is the fraudulent disposition of the proceeds of the sale; and there ought not to be much surprise if constitutional objections are found to be inherent in such an attempt to correct the evils of a dishonest

use of the proceeds of a bulk sale by interfering with the sale itself.

It is said the statute simply creates an equitable lien in favor of creditors for the purchase price of goods they themselves have furnished. It does more than that: It attempts to create a lien in favor of all creditors and against all classes of merchandise—not only such as they themselves have furnished but others as well. A merchant may owe nothing for merchandise yet his sale of his stock in bulk is void as to a judgment creditor who has simply a judgment for personal injury or for alimony or has a claim for an unpaid doctor's bill. It is then not to, be reckoned among the laws analogous to mechanics' lien laws nor is it to be likened to a vendor's lien.

Nor is it to be considered to be analogous to our recording acts. Those acts require simply a filing of notice with a public officer or with definite persons as, for instance, the "owner." This act requires some thirty other things besides. The things required to be done by our recording and registry laws are few in number, and simple in their nature; and, above all else, they are, all of them, in all instances capable of being performed by the parties *at the very time.*. It is always possible to record or register a paper. Here, if there are no books and if the invoices happen to be lost or destroyed in whole or in part then it is impossible for the seller to dispose of his stock in bulk at all.

Did the statute require jobbers who wish to retain a lien for the price of goods sold to the retailer, themselves to make some sort of registry of their own sales so that innocent purchasers might be warned, such a law—although probably impracticable—would seem to be more logically comparable to our recording and reg-. istry acts than the statute under consideration.

Again, it is not only obligatory that an inventory be taken but the taking of it is hedged round about with a multitude of onerous restrictions. For instance, it must be made by both seller and purchaser and they must be together when it is made. Sales without inventory are, in practically so many words, absolutely prohibited, if the seller owes anyone, no matter what may be the contract and wish of the parties themselves.

The framers of the statute might properly be charged with al-

most an approach to irony—permitting a sale "in bulk" to be made provided a complete, detailed inventory with the mention of the cost price of each article, be first taken by both parties together!

Moreover, it must be remembered that it is of proposed sales, not of consummated sales, that notice is to be given. Thus the spectacle is presented of every prospective purchaser in bulk going through all these requirements. These operations may have to be repeated a hundred times if so many prospective purchasers should in turn come up and then refuse to go ahead.

The statute in effect destroys a great part of the value of a stock of merchandise to one desiring to sell out. The capability of being sold is one of the most important attributes of property; and to sell in bulk is one way of giving effect to that attribute.

Now, there would be little question, if any, that a total prohibition of all kinds of sales of merchandise were wholly prohibited, as depriving a man of his property without due process of law. So, if one kind of sale of merchandise were wholly prohibited, then, to that extent, such a prohibition would be likewise ineffective. Now, it seems to me, if a man is prohibited from wholly making a sale of his property in bulk, unless, theretofore, he shall have kept true and correct books so that he may have them on hand to deliver to the proposed purchaser, or shall have kept the original invoices showing the cost price of the very merchandise then to be sold, and it shall happen that such person has not kept such books and has not the means now of supplying such books, or has not kept such original invoices, then the operation of the statute would deprive him of part of the value of his property and thus deprive him of part of his property itself, without due process of law.

The court, in In re Jacobs, 98 N. Y. (53 Sick.), 98, 105, expressed this principle (although the case is not cited as a precedent here, for the reason the facts there were not like those at bar), as follows:

"The constitutional guaranty that no person shall be deprived of his property without due process of law may be violated without the physical taking of property for public or private use. Property may be destroyed, or its value may be annihilated; it is

owned and kept for some useful purpose and it has no value unless it can be used. Its capacity for enjoyment and adaptability to some use are essential characteristics and attributes without which property can not be conceived; and hence any law which destroys it or its value, or takes away any of its essential attributes, deprives the owner of his property."

Also in *Janesville (City)* v. *Carpenter*, 46 N. W. Rep., 128, 132 (177 Wis., 288; 8 L. R. A., 808; 20 Am. St. Rep., 123):

"Any restriction or interruption of the common and necessary use of property that destroys its value, or strips it of its attributes, or to say the owner shall not use his property as he pleases, takes it in violation of the Constitution."

Also *State* v. *Julow*, 129 Mo., 163 (31 S. W. Rep., 781; 29 L. R. A., 257; 50 Am. St., 443):

"Depriving an owner of property of one of it's essential attributes is depriving him of his property within the meaning of the constitutional provision that no person shall be deprived of life, liberty or property without due process of law."

Again, this statute seems to be in plain violation of the constitutional prohibition against a state depriving any person of liberty without due process of law, for the liberty to contract is one of the most firmly established applications of that constitutional guaranty. Right to contract is both a liberty and a property right. If any person is denied the right to contract and acquire property in the manner which he has hitherto enjoyed it under the law and which others are still allowed by law to enjoy, he is deprived of both the constitutional right of liberty and property. "But what does the word 'liberty' mean in American Constitutions? It means personal liberty. This includes more than mere exemption from imprisonment. I should say that it means * * * * the right to acquire, hold and convey property." (Brannon's "The 14th Amendment," page 110). Thus, the liberty guaranteed to us in our Constitutions does not refer simply to absence of restraint of the body. The right to contract and to acquire and dispose of property, subject only to the police power and other limitations long established as "due process of law" in our jurisprudence, is protected by the fundamental law of the land.

By this statute the parties are not permitted to sell in bulk without inventory nor without mention of every article and its cost, although it may be the desire of both parties and their precise contract as it was in the case at bar, to sell without inventory and without mention of cost price.

Again, the statute violates the constitutional provision insuring the equal protection of the laws, for what other sellers, whether sellers in bulk or otherwise, are debarred from selling by such oppressive restrictions as are these? And what other sellers in bulk are obliged to reveal the cost price of every article sold?

When courts come to the consideration of statutes concerned with the exercise of police power they are reluctant to interfere with any classification which the Legislature may deem proper to make, and classifications based on comparatively slight differences have been upheld, see *State* v. *Nelson*, 52 O. St., 88; but it must be observed again that this statute is not concerned with the exercise of police power.

It is also urged that this statute has the fault of indefiniteness. But whether it is void for uncertainty or not, it seems to me, that at any rate it violates the constitutional rights of the parties in the case at bar by attempting to deprive them of their property and of their liberty to contract, without "due process of law" and by denying them the equal protection of the laws.

It is therefore ordered that the petitions of George Williams be and the same hereby are granted, and the trustee is directed within three days' time to surrender the stock of merchandise and the fixtures so as aforesaid purchased by him from the bankrupts; to which ruling the trustee excepts and is given ten days' time within which to file his petition for review and to prepare his certificate of facts thereon.

*Brady & Cashman,* for petitioner.
*Geo. H. Burrows,* for trustee.